UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

RAYMOND TIRONE, on behalf of himself and as a
representative of a class of persons similarly situated,

               Plaintiffs,

        -against-

NEW YORK STOCK EXCHANGE, INC.,

              Defendant.
_____X

**AMENDED CLASS ACTION COMPLAINT**

05 Civ. 8703
(WHP)(THK)

**Plaintiffs Request Trial by Jury**

**ECF Case**

Plaintiff **RAYMOND TIRONE**, on behalf of himself and as a representative of a class of persons similarly situated, alleges that:

1. The jurisdiction of this Court is conferred because of the presence of a federal question pursuant to 28 U.S.C. §§ 1331 arising from a claim based upon §502(e)(1) of the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. §1132, *et. seq*.

2. The venue of this action is properly placed in the Southern District of New York pursuant to 28 U.S.C. §1391(b) and 29 U.S.C. §1132(e)(2), because, upon information and belief, defendant the New York Stock Exchange, Inc. ("NYSE") is duly incorporated in New York with its principal place of business at 11 Wall Street, New York, New York 10005.

3. Plaintiff Raymond Tirone ("Tirone") resides at 25 Louise Street, Staten Island, New York 10312.

**Class action requirements**

4. Tirone brings this claim, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and a class of employees of the NYSE who have been terminated to prevent

1

them from obtaining payment of health insurance and life insurance benefits, in violation of §502, *et seq.*, of ERISA, 29 U.S.C. §1132, *et seq.*, for the period commencing January 1, 2005, through the date of this complaint (the "relevant time period.")

    5.  Tirone meets the prerequisites to bring this action on behalf of the class because:

(a) Numerosity: the class is so numerous that joinder of all members as individual plaintiffs is impracticable.  While the exact number of class members is unknown and can only be ascertained *via* discovery, plaintiff believes at least several dozen former employees of the NYSE are eligible class members.

(b) Commonality: there are questions of law and fact common to the class, including:

(i) whether the NYSE's has a uniform practice of terminating employees on long-term medical leave to prevent them from obtaining payment of health insurance and life insurance benefits;

(ii) whether class members have sustained damages and the correct measurement of those damages;

(iii) Whether the NYSE breached the terms of its employee benefits plan;

(c) Typicality: plaintiff's claims are typical of the claims of the class because plaintiff and members of the class each sustained damages arising out of the NYSE's wrongful conduct as complained of herein; and

(d) Adequacy: plaintiff will fairly and adequately protect the interests of the class. Plaintiff has no interests that are antagonistic to, or in conflict with, the interests of the class as a whole, and has engaged competent counsel to ensure protection of the interests of the class as a whole.

    6.  As an ERISA action, this action is suited for class certification pursuant to Fed. R. Civ. P. 23(b) because: i) the prosecution of separate actions by the members of the class would create a risk of adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; ii) the prosecution of separate actions by the members of the class would create a risk of inconsistent or

varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for the NYSE; iii) the NYSE, in terminating Tirone to prevent him from obtaining payment of health insurance and life insurance benefits, acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief; and iv) questions of law and fact common to members of the class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**Background: Tirone's disability**

7.  The NYSE hired Tirone in approximately February of 1969.

8.  During Tirone's employment, the NYSE provided Tirone with an employee benefits plan (the "plan") that included, *inter alia*, health care benefits, disability benefits, life insurance benefits, and a retirement plan.

9.  In approximately 1979, Tirone began to suffer from severe headaches, vertigo, dizziness, confusion, and double vision, (Tirone's "symptoms.")

10.  In approximately 1979, Tirone visited several doctors to have these symptoms addressed.

11.  In approximately June 1981, Tirone's doctor discovered that a brain tumor (the "tumor") had developed on Tirone's brain stem.

12.  On approximately October 15, 1981, Tirone had surgery to remove the tumor (the "October 1981 surgery.")

13.  Tirone was placed on medical leave for this surgery on October 15, 1981, but returned to the NYSE in approximately April 1982.

14. Despite the surgery to remove the tumor, Tirone continued to have symptoms while at work, but not as severely as the symptoms he experienced in 1979.

15. In approximately 1984, Tirone was promoted to Senior Trading Investigator and Market Surveillance despite these symptoms.

16. Eight years after the surgery, on approximately October 5, 1989, Tirone suffered a seizure while driving his car.

17. As a result of the seizure, Tirone lost control of his vehicle and collided with a tree.

18. During Tirone's treatment for this accident, Tirone's doctors discovered that scar tissue at the site of the October 1981 surgery had "changed," "reformed," or "hardened."

19. The doctors determined that this scar tissue was the cause of Tirone's seizure.

20. After seeking several medical opinions, a doctor informed Tirone that he could undergo a second surgery to remove the scar tissue from his brain stem.

21. However, Tirone's primary neurologist advised Tirone not to have surgery because there was less than a 50% chance of stopping Tirone's symptoms, and it was a very dangerous operation.

22. As a result of this advice, Tirone opted not to have the surgery to remove the scar tissue.

23. Two months after the accident, in approximately the fourth week of November 1989, Tirone returned to work at the NYSE.

24. On approximately February 5, 1990, Tirone suffered another seizure – this time while at work.

25. As a result of this second seizure, the NYSE placed Tirone on medical leave of

absence again, effective approximately February 5, 1990.

26. The continuation of Tirone's symptoms prevented Tirone from returning to work at the NYSE.

27. Tirone offered to work from home, but the NYSE rejected the offer, "due to the confidential nature of NYSE research."

28. Since Tirone could not return to work, the NYSE classified him as "totally disabled" within the meaning of NYSE's plan.

29. Upon information and belief, the NYSE classified disabled employees on a scale ranging from one to five – one being the lowest disability ranking and five indicating the employee is totally disabled.

30. The NYSE classified Tirone's condition at a level four disability.

**NYSE benefits to which Tirone is entitled**

31. Upon being classified as "totally disabled," Tirone was entitled to 60% of his salary, long-term disability benefits, full health care benefits, social security benefits, and life insurance benefits.

32. As of the date of this complaint, Tirone continues to receive 60% of his salary and his long-term disability benefits from the carrier of the plan, 1st Unum.

33. As provided by the plan:

> Health care benefits continue for you and eligible family members for as long as you are totally disabled on the same terms and conditions, as the Employee Benefits Plans Committee (or its delegates) determines according to the terms of the plan.

34. With over ten years of service, NYSE's plan provides that Tirone would be entitled to retire at age 55 and he and his family would retain full health care benefits.

**NYSE's treatment of Tirone while he was on medical leave**

35. After the NYSE placed Tirone on medical leave in 1990, Alice MacDermeid ("MacDermeid"), Senior Benefits Administrator for the NYSE, requested that Tirone and his doctors complete annual disability forms in order for Tirone to maintain his disability status.

36. Initially, MacDermeid required these forms to be completed once a year, but by 2005, this number had increased to four times per year.

37. Several times during this period, Tirone spoke to MacDermeid to inquire about why the filing requirements had become so repetitive.

38. During one of these conversations between Tirone and MacDermeid, in approximately 2004, MacDermeid questioned the legitimacy and severity of Tirone's disability, making the following statements:

   a. "If someone is really disabled they have to be under the constant care of a doctor. There are these people on disability who say they cannot work, but can... that's why we have to send forms four times a year."

   b. "You could always come back to work Ray."

   c. "I have to put in a full days work."

**Tirone's termination and the termination of his health care benefits**

39. On approximately, November 9, 2004, MacDermeid called Tirone and said, "Ray, I have some bad news. As of March 31st, your health insurance benefits will be terminated."

40. Tirone responded, "What's my status going to be? Before, I was assured [by NYSE management] that if they [*i.e.*, my doctors] ever found a cure for my condition, I would be able to come back to the NYSE and have a job somewhere in Market Surveillance."

41. MacDermeid replied, "Well your status has been changed. You're being

terminated."

42. On approximately March 16, 2005, Tirone received a letter from John Martino ("Martino"), the Director of Employee Benefits for the NYSE, which stated, *inter alia*, the following:

> This letter is a follow-up to our telephone call of November 9, 2004. As you were notified in that call, your status as an "active" employee of the NYSE will cease effective March 31, 2005 as a result of changes to the NYSE's leave of absence policy effective January 1, 2005, due to the fact that you have not returned to work within two years of the beginning of your leave of absence. This letter will inform you of the effect of this change on your NYSE benefits.

43. The March 16, 2005, letter provided notice that Tirone's health insurance benefits and life insurance benefits would cease as of March 31, 2005.

44. In approximately the third week of March 2005, Tirone called Martino to inquire about the letter.

45. During this conversation, Tirone asked Martino, "Why are they doing this?"

46. Martino responded, "There is a change in the industry. There are new corporate leaders. Everything is being cut. ... This is all due to budget cuts."

47. Tirone requested a summary of the "changes to the NYSE's leave of absence policy" as referenced in the March 16, 2005, letter.

48. The NYSE sent Tirone xeroxed copies of the "NYSE policy revisions for all managerial/professional employees effective January 1, 2005," (the "2005 policy revisions.")

49. Under a section titled "long-term disability," the 2005 policy revisions state, *inter alia*, the following:

> Employees who have been out on a medical leave for two years from the beginning of the leave and are unable to return to work will be terminated from the Exchange.

7

50.  On page 4 of the "General Information" section of the plan it provides, *inter alia*, the following:

> No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a (pension, welfare) benefit or exercising your rights under ERISA.

51.  Thus, the NYSE intentionally amended its plan to (i) provide for the termination of all employees on medical leave for more than two years, and (ii) create a pretext for its decision to terminate Tirone, and those similarly situated who were disabled and unable to return to work, to prevent payment of health care and life insurance benefits under the plan.

**Exhaustion of administrative remedies**

52.  On July 20, 2005, Tirone sent a letter to Martino citing the above provisions, stating a claim for benefits and asking that his benefits be reinstated.

53.  By letter, dated August 11, 2005, the NYSE denied Tirone's claim to have his benefits reinstated, stating that:

> ...your employment was terminated effective March 31, 2005, because you had been on a long term disability leave of absence for more than two years and were [sic] no longer providing any services for the NYSE.
>
> ***
>
> While you are entitled to accrued NYSE retirement benefits which become vested and nonforfeitable under the terms of the NYSE's retirement plans, your participation in the NYSE group health plan has always been contingent on you being an employee of the NYSE.  When that status changed, you were no longer eligible for benefits under that plan (other than through COBRA).

54.  By letter, dated August 18, 2005, Tirone appealed the denial of his claim to have his benefits reinstated, stating the following:

> I have received your letter of August 11, 2005, ... denying my claim to have my health care and life insurance benefits reinstated, and I write to appeal the decision contained in the August 11th letter.

8

> I do not believe that the August 11th letter is responsive to my July 10th claim since the New York Stock Exchange has merely terminated me to avoid payment of accrued benefits which could not be taken from me by termination.
>
> Please accept this letter as well as my July 20, 2005, letter as my appeal.

55. The NYSE responded by letter, dated September 23, 2005, with the following:

> Please be advised that in accordance with the NYSE Plan's claims procedure and applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the August [18,] 2005 Letter has been treated as a formal claim for benefits under the NYSE plan.
>
> ***
>
> For the reasons set forth below, your claim for benefits under the NYSE Plan is denied. This letter constitutes your formal notice of this decision.

56. Tirone responded on September 29, 2005, with the following:

> Your letter of September 23, 2005, was in response to my "appeal." I do not see why it is necessary that I have to appeal again but if so please forward my new appeal request to the "appropriate named fiduciary" or the "Employee Benefits Committee" so that the appeal may be resolved.

57. In response to the September 29, 2005, letter, Tirone received two letters dated November 30, 2005: the first was entitled "Benefit Claim Appeal – Notification of EBPC Decision" (the NYSE's "notice of decision"), and the second was entitled "Final Decision on Benefit Claim Appeal" (the "final decision").

58. The notice of decision stated, *inter alia*, the following:

> A special meeting of the Employee Benefit Plans Committee ("EBPC") was held on November 15, 2005. This special meeting was called for the purpose of considering your appeal dated September 29, 2005, which was received by the Exchange on October 4, 2005.
>
> After careful consideration of your appeal and discussion of all of the relevant facts and circumstances, the EBPC determined to deny your claim for reinstatement of health care and life insurance coverage under the Welfare Plan of the New York Stock Exchange, Inc. (the "Welfare Plan"). On behalf of the EBPC, I have enclosed a copy of the EBPC's determination.

59. The final decision of the EBPC stated, *inter alia*, the following regarding Tirone's

appeal:

> Given the facts and the applicable plan provisions, it is the Committee's determination that your coverage under the Health Plan and the Group Life Insurance Plan ceased effective January 1, 2005 because that is when you ceased being classified as an "employee" and ceased being able to satisfy the Health Plan's and Group Life Insurance Plan's eligibility criteria for participation. The fact that NYSE elected gratuitously to further extend you administrative classification and coverage to March 31, 2005, outside the terms of its medical leave of absence policy and the Welfare Plan, does not affect the Committee's determination and does not in any event provide you a basis to seek coverage for yourself and your family members for the rest of your life.

60. In a section of the final decision entitled "Factual Background," the EBPC stated the following:

> In considering your appeal, the Committee requested and received from NYSE information regarding your employment background. This documentation shows that you have been on leave since January 24, 1990 and have been receiving long-term disability benefits since July 23, 1990. Until January 1, 2005, when it modified its medical leave of absence policy, NYSE continued to classify you as an "employee" during your leave in order to allow you to continue participating in the Welfare Plan (which conditions participation on an individual being classified as an "employee").
>
> Effective January 1, 2005, NYSE implemented a number of policy revisions affecting Managerial/Professional Employees. One of these changes was to its medical leave of absence policy. Effective January 1, 2005, individuals on long-term disability will maintain their employee classification for a maximum of two years from their date their leave commences. Periods of leave taken before January 1, 2005 are counted toward the two-year maximum.
>
> In November 2004, you were notified of NYSE's change in policy. Given that you had been on leave for well over two years at the time the policy amendment was made effective. your [sic] classification as an employee should have ceased on January 1, 2005. However, in an effort to afford you sufficient time to consider whether to return to work and retain your classification as an employee, NYSE extended your classification and coverage to March 31, 2005. When you failed to return to work by that date, your classification as an employee ceased as did your coverage under the Welfare Plan.

61. However, in the first footnote of the final decision, the EBPC stated the following

regarding Tirone's date of termination:

> The Committee observes, however, that you seem to be proceeding on the incorrect assumption that you experienced a "termination of employment" on March 31, 2005. The decision taken by NYSE, pursuant to its modified medical leave of absence policy effective January 1, 2005, was merely to terminate your administrative classification as an employee, which it had gratuitously afforded you since 1990. Your employment terminated back on January 24, 1990 when you commenced your leave of absence and ceased performing any services for NYSE.

62. Thus, based upon the correspondence between the NYSE and Tirone, the NYSE has changed Tirone's date of termination several times throughout his administrative appeal.

63. The following chart summarizes the dates that the NYSE provided to Tirone as the date of his termination as detailed in the correspondence noted *supra*:

| Date of letter from NYSE | Date provided by NYSE as Tirone's date of termination | Content of correspondence |
|---|---|---|
| March 15, 2005 | March 31, 2005 | "[Y]our status as an 'active' employee of the NYSE will cease effective March 31, 2005, ... ." |
| August 11, 2005 | March 31, 2005 | "[Y]our employment was terminated effective March 31, 2005, ... ." |
| September 23, 2005 | March 31, 2005 | "[A]ccording to the NYSE's records, your employment was terminated effective March 31, 2005, ... ." |

| November 30, 2005 | a) | January 24, 1990 | "Your employment terminated back on January 24, 1990 when you commenced your leave of absence and ceased performing any services for NYSE." |
| | b) | January 1, 2005 | "Given that you had been on leave for well over two years at the time the policy amendment was made effective. your [sic] classification as an employee should have ceased on January 1, 2005. However, *in an effort to afford you sufficient time to consider whether to return to work and retain your classification as an employee*, NYSE extended your classification and coverage to March 31, 2005." (Emphasis added.) |
| | c) | March 31, 2005 | |

64. Tirone has exhausted the NYSE's administrative remedies.

65.  As is set forth above, the NYSE violated the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. §1132, *et. seq.*, by terminating Tirone, and the other class members, to prevent payment of healthcare and life insurance benefits – a direct violation of the language of NYSE's plan.

66.  By reason of the foregoing, Tirone is entitled to:

   a. approximately $40,000 for health insurance and life insurance benefits in arrears, plus interest, since his termination on March 31, 2005, to the date of trial; and

   b. reinstatement as an active employee of the NYSE on medical leave, or, in the alternative, payment of approximately $375,000 for future health insurance and life insurance benefits which Tirone is entitled to for the remainder of his life[1]; and

---

[1] Tirone was 54 years old at the time of his termination. The average life expectancy for a 54 year old male is 23.01 years (based on annuity tables.) $375,000 is the approximate cost of health insurance and life insurance benefits Tirone is entitled to for the next 23.01 years.

    c.    the costs of this action, including fees and costs of experts, together with interest and attorney's fees; and

    d.    such other and further relief as this Court deems just and equitable.

67. By reason of the foregoing, all other class members, during the relevant time period, are entitled to:

    a.    all health insurance and life insurance benefits in arrears, plus interest, since termination of benefits; and

    b.    reinstatement as active employees of the NYSE on medical leave with full benefits as of the respective dates of their respective terminations, or, in the alternative, payment of the cost of future health insurance and life insurance benefits to which class members are entitled; and

    c.    the costs of this action, including fees and costs of experts, together with interest and attorney's fees; and

    d.    such other and further relief as this Court deems just and equitable.

Wherefore it is respectfully requested that this Court award the relief set forth in paragraphs 66 and 67.

December 2, 2005

    /s/   Peter G. Eikenberry
**PETER G. EIKENBERRY** (PGE-7257)
*Attorney for plaintiff Raymond Tirone*
74 Trinity Place, Suite 1609
New York, New York 10006
(212) 385-1050